UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                    Case No. 1:24-cr-20021-01

v.                                         Honorable Thomas L. Ludington
                                         United States District Judge

ARMANDO SCHALK,

                Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

On June 28, 2023, the United States charged Defendant Armando Schalk with (1) possession with the intent to distribute fentanyl and (2) possession of a firearm in furtherance of a drug trafficking crime. These charges were prompted by evidence uncovered from a search of Defendant's car—evidence Defendant now seeks to suppress. Defendant argues that the warrant authorizing the search of his car lacked probable cause. He also contends that the good-faith exception to the exclusionary rule is inapplicable, so evidence seized during the warrant's execution is inadmissible at trial. Both arguments lack merit, so Defendant's Motion will be denied.

**I. BACKGROUND**

**A. The Investigation**

The following information is drawn from an affidavit that Detective Jeremy Sauve—a Bay Area Narcotics Enforcement Team (BAYANET) detective with eight years of law enforcement experience—prepared in applying for a search warrant, ECF No. 35-3.

On July 26, 2023, the Bay City Police Department (BCPD) responded to an emergency call. *Id.* at PageID.100. In responding to this emergency, the officers saved an unresponsive infant who somehow overdosed on fentanyl. *Id.*

An investigation into child abuse and neglect followed. *See id.* Bay City law enforcement identified two suspects. *See id.* The two child abuse suspects stated that they used "perks"—a slang term for fentanyl pills. *Id.* These two suspects also indicated that a man named "Armando" visited the location where the infant consumed fentanyl before the emergency call. *Id.*

The child abuse investigation wasn't the first time Bay City law enforcement heard the name Armando. *See id.* About three weeks before the infant overdose, the BCPD received a call that Defendant Armando Schalk and Justin Mannie were at a residence where they were "not wanted" and possessed pistols. *Id.* An investigation into that incident uncovered cocaine on the property and a security video showing Defendant with a gun in his waistband. *Id.* at PageID.100–01.

At some unspecified time after the July 26, 2023 infant overdose, Detective Sauve contacted a BCPD detective who further investigated the infant's overdose. *See id.* at PageID.100–01. Detective Sauve alleges that the two child abuse suspects reported receiving fentanyl pills from "Armando" and that "Armando received these pills "from Patrick on 22nd Street." *Id.* (internal quotations omitted). The suspects also reported that Armando "stays with Patrick" on 22nd Street. *Id.* And the two suspects described to the BCPD detective four more details of the suspected drug-trafficking activities: (1) there was an alley near Patrick's residence; (2) "Armando drives either a Chrysler 300 or a Charger"; (3) Armando and Patrick park their cars behind Patrick's residence; and (4) Patrick has "around 200 pills on his person at a time . . . to sell." *Id.*

- 2 -

On August 29 and 30, 2023, Detective Sauve surveilled 1013 22nd Street, Bay City, Michigan ("22 Street Residence"): Patrick Chamberlain's residence. *See id.* at PageID.101–02. By the time of this surveillance, Bay City law enforcement had been investigating Chamberlain for fentanyl trafficking since November 2022. *See id.* at PageID.99–101. While observing Chamberlain's residence on August 29th, Detective Sauve allegedly saw Mannie run through a private alley near the residence and enter it through the back door. *Id.* at PageID.101. After that, Detective Sauve observed what he suspected was a drug transaction between Chamberlain and Mannie. *Id.* On August 30th, Detective Sauve observed a similar "possible hand-to-hand narcotics transaction," where an unidentified male left the 22nd Street Residence through the alley. *Id.* at PageID.101–02.

Detective Sauve's surveillance continued into September of 2023. *See id.* During this time, Detective Sauve observed Chamberlain routinely park his car behind the 22nd Street Residence. *Id.* at PageID.101. And he saw Defendant at the residence. *Id.* Defendant allegedly would allegedly park a black Chrysler 300 car behind the residence often, enter it at night, and leave it during the day—behavior Detective Sauve deemed consistent with Defendant living at the 22nd Street Residence. *Id.* That wasn't all he observed, though. *Id.* He also saw multiple "hand-to-hand" exchanges at the residence "when [Defendant] and Patrick Chamberlain were at the home." *Id.* at PageID.102.

On September 11, 2023, a probation agent contacted Detective Sauve. *Id.* The agent indicated that one of his probationers used fentanyl in early August 2023. *Id.* The probationer had also instructed a family member to contact the agent about "the probationer and their fentanyl dealers"—who the family member identified as Defendant and Patrick Chamberlain. *Id.* And the family member explained that they would meet Defendant at a party store that "is approximately

450 feet from" the 22nd Street Residence, where Defendant would arrive in a "black Chrysler 300." *Id.* At some point, Detective Sauve confirmed that Defendant had a black 2012 Chrysler 300 registered in his name. *See id.* at PageID.98.

Based on this investigation and his experience investigating drug crimes, Detective Sauve applied for a search warrant on September 12, 2023. *See id.* at PageID.98, 104–05. Specifically, Detective Sauve's application sought to search five locations: (1) the 22nd Street Residence and "each person and vehicle located at the [residence] and associated with the residence"; (2) Defendant's person; (3) Patrick Chamberlain's person; (4) Patrick Chamberlain's vehicle; and (5) Defendant's black Chrysler 300. *Id.* at PageID.98. There, Detective Sauve expected to find the following evidence:

> Controlled substances including but not limited to: fentanyl, cocaine, crack cocaine, heroin, methamphetamine, and; proceeds derived from the sale and or distribution of controlled substances; equipment, paraphernalia, packaging materials and or items related to the preparation, sale and or distribution of controlled substances including but not limited to scales, grinders, mixing or cutting or diluting agents, computers and or cellular telephones or other means of electronic communications and the contents thereof; records relating to the obtaining, manufacture, processing, compounding, sale, and or distribution of controlled substances whether in written form or otherwise; photographs or video or other electronic depictions of controlled substances, and or proceeds derived from the sale or distribution of controlled substances, and or persons and or places involved in the obtaining, manufacture, processing, compounding, sale and or distribution of controlled substances, and or firearms and or equipment used or intended to be used in the obtaining, man obtaining, manufacture, processing, compounding, sale and or distribution of controlled substances; firearms and or ammunition; records and or documents or data of whatever nature and/or type showing evidence of ownership, occupancy, residence and or control of the location searched or the items found therein and or linking persons known or unknown to the searched premises and or contents; financial records.

*Id.* at PageID.98–99. That day, Magistrate Janice E. Doner of the 74th District Court in Bay County, Michigan, authorized a warrant to search all five requested locations. ECF No. 35-2.

**B. The Search**

BAYANET executed the search warrant on September 13, 2023. ECF Nos. 35 at PageID.78; 38 at PageID.111. To start, BAYANET searched the 22nd Street Residence, where it found drugs, money, and weapons. ECF No. 35 at PageID.78. At that time, Defendant wasn't at the residence, so law enforcement located and surveilled him. *See* ECF Nos. 35 at 78; 38 at PageID.111. After Defendant left a different residence in his black Chrysler 300 with a fanny pack, law enforcement stopped the car. *Id.* Mannie leaped out of the car and fled. *Id.* Officers tracked down and apprehended Mannie, who had a fanny pack that he said Defendant gave him. *See* ECF Nos. 35 at 78; 38 at PageID.111–12. The fanny pack contained 33.71 grams of fentanyl pills and a pistol with an extended magazine and no serial number. ECF Nos. 35 at 78; 38 at PageID.112. After apprehending Mannie, officers searched Defendant's Chrysler 300, finding fentanyl pills, a firearm with an extended magazine, ammunition, Ziploc bags, and $15,960 of cash. *See id.* Both Mannie and Defendant were arrested, and Defendant allegedly made incriminating statements following his arrest. *See* ECF No. 35 at PageID.78.

**C. This Case**

The Government then brought charges. On January 10, 2024, the Government charged Defendant and Mannie with possessing fentanyl with the intent to distribute, 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (Count I), and Defendant alone with possessing a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c) (Count II). ECF No. 1. For reasons unknown, the Government charged Patrick Chamberlain with *conspiracy* to possess fentanyl with intent to distribute in a separate case. *See United States v. Chamberlain*, Case No. 24-CR-20096 (E.D. Mich. Feb. 28, 2024).

Regardless, in this case, Mannie pleaded guilty in September 2024. *See* ECF No. 37. On September 23, 2024, Defendant moved to suppress "all evidence seized from the search of his vehicle, as well as statements made, pursuant to the search warrant." ECF No. 35 at PageID.69. In essence, Defendant argues that Detective Sauve's affidavit did not provide probable cause to search Defendant's car. *Id.* at PageID.70.

## II. LEGAL STANDARD

The federal constitution applies to warrants issued in state courts. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022). Under the Fourth Amendment, a judge may issue a search warrant only "upon probable cause." U.S. CONST. amend. IV. Probable cause isn't a precise standard, but it's "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Indeed, courts define probable cause as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (cleaned up). A judge deciding whether to issue a warrant must take a practical, common-sense approach—not a hyper-technical one. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The ultimate question is whether a warrant's supporting affidavit demonstrates a "fair probability" that officers will find evidence of a crime at a specific place. *Id.*

When a different court later reviews the decision authorizing the warrant, the court must determine whether the affidavit gave the authorizing judge a "substantial basis" for finding probable cause. *Id.* at 238–39. Reviewing courts may not rubber-stamp a probable cause determination. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc). At the same time, courts owe "great deference" to the issuing judge. *Id.* And the court should only reverse the probable cause determination if it was arbitrary. *Id.* (quoting *Gates*, 462 U.S. at 236); *see also United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001).

This review stays within the affidavit's "four corners." *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). And the focus is on what's there—not what's missing. *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir. 2024) (en banc) *cert. denied*, No. 24-5864, 2024 WL 4874727 (U.S. Nov. 25, 2024). All said, if the affidavit's "good qualities" provide a "substantial basis" for the probable cause finding, the issuing judge's decision stands. *Id.* at 462–63. If not, it doesn't. *Id.*

### III. DISCUSSION

Defendant's suppression argument is twofold. *See* ECF No. 35 at PageID.70–71. First, Defendant argues that Detective Sauve's affidavit did not provide probable cause to search his Chrysler 300 because it (1) relied on three anonymous sources without substantial independent police corroboration, (2) failed to show a sufficient nexus between the drug-trafficking activities and his car, and (3) relied on stale information. *Id.* Second, Defendant contends that the exclusionary rule's good-faith exception does not apply, so this Court must suppress all evidence stemming from the search of his Chrysler 300. *Id.* at PageID.71. At day's end, this Court need not suppress this evidence.

### A. Probable Cause

### 1. Anonymous Sources and Independent Corroboration

To start, Defendant argues that Detective Sauve's affidavit did not provide probable cause to search Defendant's Chrysler 300 because three of the affidavit's sources were "anonymous." *Id.* at PageID.81–84. Specifically, Defendant argues that the two child abuse suspects from the infant overdose investigation and the probationer's family member who spoke with law enforcement were all anonymous sources. *See id.* And law enforcement's investigation, Defendant argues, did not substantially corroborate these sources. *See id.* Defendant thus contends that the

three sources' statements are too unreliable to support a probable cause finding. *See id.* This argument misses the mark.

True, courts must treat probable cause determinations based on "hearsay information provided by . . . anonymous tipsters" differently than others. *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003). Unlike other sources, anonymous tipsters "demand more stringent scrutiny of their veracity, reliability, and basis of knowledge than" other sources. *Id.* Absent indicia of an anonymous source's reliability, "courts insist that the affidavit contain substantial independent police corroboration" of the anonymous tipster's statements to establish their reliability. *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005).

But here, the three sources that Defendant challenges are not anonymous tipsters. Rather, based on *United States v. May*, 399 F.3d 817 (6th Cir. 2005), they are known sources—albeit unnamed in the affidavit—who are "subject to prosecution for making a false report, [and] are thus entitled to far greater weight than those of an anonymous source." (holding an unnamed informant's statements didn't require independent corroboration and distinguishing "anonymous tipsters," whose identities are unknown to law enforcement, from "known sources" who are unnamed in the affidavit); *see also Sanders*, 106 F.4th at 464. Indeed, the affidavit contains information about how law enforcement knew the two child abuse suspects (because of its infant overdose investigation) and the probationer's family member (because of its probationer drug-use investigation). *See* ECF No. 35-3 at PageID.100–02. Thus, applying *May*, the affidavit didn't need to detail independent police corroboration. *See United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009); *cf. Helton*, 35 F.4th at 517 (finding the unnamed source was an "anonymous source" when the affidavit "only said, 'A reliable source advised he was at the residence a few days ago when a

subject he was with purchased a half pound of methamphetamine,'" because "there [was] no indication of whether the source is known to law enforcement or the issuing judge").

Given *May*'s distinction between anonymous tipsters and unnamed but known sources, Defendant's reliance on *Illinois v. Gates*, 462 U.S. 213 (1983), *see* ECF No. 35 at PageID.83, is misplaced. In *Gates*, the Supreme Court treated a source as an anonymous tipster requiring substantial police corroboration of reliability when the source sent an anonymous letter to the police. 462 U.S. at 243–44. But unlike here, in *Gates*, law enforcement did not know who authored the letter. *Id.* at 225–26. Again, in this case, like in *May*, the affidavit contains details demonstrating that law enforcement knew the three challenged sources' identities. *See* ECF No. 35-3 at PageID.100–02.

And even if the affidavit needed to include information showing that law enforcement substantially corroborated the reliability of the three challenged sources' statements, it did. Not much is necessary for substantial corroboration. *See May*, 399 F.3d at 824; *see also United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) ("[I]t has been the rare case in which the Sixth Circuit has found a search warrant based on an informant tip to be inadequate *if* the information has been corroborated to some degree.") (emphasis in original); *Dyer*, 580 F.3d at 392 (same). Indeed, "any set of facts that support the accuracy of the information supplied by the informant" will do. *May*, 399 F.3d at 824. That includes facts the officers already know when they receive the tip. *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000) (holding that an officer's prior knowledge that one car was rebuilt at the defendant's auto shop using stolen parts substantially corroborated an anonymous tip that the defendant rebuilt cars using stolen parts).

Sixth Circuit cases establish that surveillance or other investigatory methods satisfy the substantial corroboration threshold when they substantiate incriminating details of a source's

statements. Take *United States v. Burrell*, 114 F.4th 537 (6th Cir. 2024). There, a tipster said the defendant ran drug operations at multiple addresses and used rental cars for drug transactions. *Id.* at 551. So officers surveilled the defendant. *Id.* They observed him using rental cars and having frequent, short-term interactions across Detroit. *Id.* Based on their training, the officers concluded these looked like drug deals. *Id.* The officers also watched the defendant drive from Michigan to Ohio, briefly enter another car, and leave. *Id.* Later, officers stopped that car's owner and found drugs inside, and the owner's description of her dealer matched the defendant. *Id.* The Sixth Circuit held this surveillance and investigation—featuring rental cars, suspected drug deals, and the car owner describing the defendant—was "more than sufficient" to corroborate the tipster. *Id.*

Or take *United States v. May*, 399 F.3d 817 (6th Cir. 2005). In *May*, an informant who was involved in local drug activities told officers that he planned to cook cocaine for the defendant at a particular residence. *Id.* at 825. The officers then set up surveillance and watched the informant enter the residence. *Id.* Later, the informant told the officers that he carried out his plan to cook cocaine for the defendant. *Id.* The Sixth Circuit held that this surveillance, coupled with the informant's ties to drug activities, satisfied the substantial corroboration threshold. *Id.* (noting that "[t]he fact that a prominent figure in the local drug scene was seen entering [the defendant's] home," by itself, "would constitute independent corroboration"); *see also Dyer*, 580 F.3d at 392–93 (holding that officers substantially corroborated an informant's reliability when officers observed a cabin and vehicles that matched a description the informant provided and ran criminal history reports that showed the defendant was associated with drug activities); *United States v. King*, 227 F.3d 732, 742 (6th Cir. 2000) (finding substantial corroboration when the officers confirmed that a car described by the informant was registered to the defendant, the address the

informant gave officers matched the defendant's, the defendant had a history with drugs, and a drug dealer was recently at the defendant's residence).

Against that legal backdrop, here, Detective Sauve made a significant effort to corroborate the three challenged sources' reliability. Start with the two child abuse suspects' statements from the infant overdose investigation. Recall that these suspects reported the following:(1) they bought fentanyl from Defendant; (2) Defendant "stays with Patrick" at the 22nd Street Residence; (3) there was an alley near the residence; (4) "Armando drives either a Chrysler 300 or a Charger"; (5) Defendant and Patrick park their cars behind the 22nd Street Residence; (6) Patrick has "around 200 pills on his person at a time . . . to sell." ECF No. 35-3 at PageID.100–01.

Detective Sauve's surveillance of the 22nd Street Residence corroborated nearly all that information. *See, e.g., id.* at PageID.98, 101–02. He verified that a man named "Patrick" lives at the 22nd Street Residence. *Id.* at PageID.101–02. He saw the alley near the residence. *Id.* He observed that Defendant (at least sometimes) stayed overnight at the 22nd Street Residence— entering during the evening and leaving in the morning. *Id.* He noted that Chamberlain and Defendant parked their cars behind the residence. *Id.* He witnessed numerous hand-to-hand transactions during which Defendant was present, which, given his training and experience, resembled drug deals.[1] *Id.* at PageID.101–02. He confirmed that Defendant owned a black Chrysler 300 and saw him driving it. *Id.* at PageID.98, 101–02. More to the point, the two suspects specifically said, "Armando drives either a Chrysler 300 *or* a Charger," *id.* at PageID.101

---

[1] Defendant takes issue with the fact that law enforcement didn't corroborate the drug sales with controlled drug purchases. ECF No.35 at PageID.84. But again, what Detective Sauve and law enforcement didn't do doesn't matter; what matters is whether what they did to corroborate the sources' information satisfied the substantial corroboration threshold. *Sanders*, 106 F.4th at 463; *see also Dyer*, 580 F.3d at 392–93. And in any event, even if what they didn't do was relevant, controlled purchases are not required to meet the substantial corroboration threshold. *United States v. Hargis*, No. 22-5651, 2023 WL 2238658, at *4 (6th Cir. Feb. 27, 2023) (collecting cases).

(emphasis added). This statement bolsters their reliability, suggesting they knew about Chamberlain's Charger, another car tied to the drug activity. *Id.* In the end, Detective Sauve's surveillance and investigation, *id.* at PageID.98, 100–02, mirrored—and in many ways surpassed—the efforts upheld as sufficient in *Burrell*, *May*, *Dryer*, and *King*.

And Detective Sauve sufficiently corroborated the information from the probationer's family member (the third challenged source). Again, the probationer's family member indicated that the probationer and family member bought fentanyl from Defendant, who "sells . . . for Patrick Chamberlain," at a party store near the 22nd Street Residence from a "black Chrysler 300." *Id.* at PageID.102. By the time Detective Sauve received this information, his investigation had already confirmed that Defendant drove a black Chrysler 300 and had ties to fentanyl trafficking, Patrick Chamberlain, and the 22nd Street area. *See id.* at PageID.100–02. That corroboration is sufficient; after all, any facts supporting "the accuracy of the informant's information" work, *May*, 399 F.3d at 824, including facts officers already know when they receive such information, *Tuttle*, 200 F.3d at 894.

In sum, Defendant's argument that the three sources' statements are too unreliable to support a probable cause finding lacks merit. First, the sources were known—even if unnamed—meaning Detective Sauve's affidavit didn't need to include rigorous details about their reliability or how law enforcement corroborated them. Second, even if the affidavit required such details, Detective Sauve's investigation and surveillance sufficiently corroborated the sources' reliability.

### 2. Nexus Between Defendant's Car and Drug Trafficking Evidence

Having determined that the challenged sources were sufficiently reliable, the next issue is whether Detective Sauve's affidavit established a nexus between Defendant's alleged drug activities and the Chrysler 300. It did. A warrant application's affidavit must contain sufficient

facts to establish a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). The nexus inquiry is fact-intensive, turning on a probable cause staple: the totality of circumstance. *Burrell*, 114 F.4th at 551. Indeed, "[m]any roads . . . can lead to a probable cause nexus." *Sanders*, 106 F.4th at 462; *see also United States v. Sneed*, 385 F. App'x 551, 556 (6th Cir. 2010) (noting that "the Sixth Circuit, along with numerous other Circuits, has consistently held that" under the circumstances of a case, courts can infer "a nexus  . . . based on the nature of the evidence sought and the type of offense") (collecting cases).

The affidavit establishes a nexus between the Chrysler 300 and the drug evidence sought. For starters, the affidavit indicates that Defendant drove this car to Chamberlain's 22nd Street Residence and stayed overnight at times, a place where drug dealing occurred, *see* ECF No. 35-3 at PageID.100–02. *See United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) (finding a nexus between drug dealing and the defendant's car parked at a dealer's house). More critically, the affidavit cites reliable sources stating Defendant sold fentanyl, often away from Chamberlain's house, driving the car to the deals. *See* ECF No. 35-3 at PageID.100–02. A commonsense inference thus arises: Defendant used the car to transport and store evidence of drug trafficking during the alleged ongoing deals. And based on his experience, Detective Sauve stated that he knows dealers often use their vehicles for drug activities, *see* ECF No. 35-3 at PageID.104—activities in which the affidavit provides ample indication Defendant was involved—bolstering that inference. *See Sanders*, 106 F.4th at 466 (inferring there "was a near certainty" of evidence in the defendant's car when the affidavit indicated the defendant drove his car to drug deals); *see also Sneed*, 385 F. App'x at 556 (inferring a defendant connected to a bank robbery stored evidence of the robbery in his car).

### 3. Staleness

Shifting to Defendant's staleness argument, the information included in Detective Sauve's affidavit wasn't stale. Because evidence "is often moved from place to place, information about its whereabouts can grow stale over time." *United States v. Church*, 823 F.3d 351, 356 (6th Cir. 2016). And because stale information cannot establish a fair probability that officers would find specific evidence at the relevant location during a search, stale information cannot establish probable cause. *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006); *United States v. Perry*, 864 F.3d 412, 414–15 (6th Cir. 2017).

Whether an affidavit's information is stale is a case-by-case analysis. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (citing *Sgro v. United States*, 287 U.S. 206, 210–11 (1932)). Under this analysis, "the length of time between the events listed in the affidavit and the application for the warrant" is salient but not dispositive. *Id.* At its core, the staleness analysis turns on "'the inherent nature of the crime'" and whether an affidavit establishes that officers have a fair probability of finding evidence at the searched property when they search it. *Spikes*, 158 F.3d at 923 (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)). In that vein, the Sixth Circuit has provided four factors to guide staleness inquiries: (1) "the character of the crime"; (2) "the criminal"; (3) "the thing to be seized"; and (4) "the place to be searched." *Abernathy*, 843 F.3d at 250 (citing *United States v. Hammond*, 351 F.3d 765, 771–72 (6th Cir. 2003)). These factors are addressed below, demonstrating that the information in Detective Sauve's affidavit was not stale.

### a.

Beginning with the first factor—"the character of the crime"—courts assess whether the alleged crime was a "chance encounter in the night" or ongoing. *Abboud*, 438 F.3d at 572. Where,

as here, the crime involved drug trafficking, whether the trafficking was ongoing "exists upon a continuum ranging from an individual who effectuates the occasional sale" from his or her personal supply, "to an . . . established and notorious drug den." *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006). When the affidavit suggests that the crime involved an ongoing drug enterprise, the affidavit's information is seldom stale. *See, e.g.*, *Greene*, 250 F.3d at 481; *see also United States v. Barnes*, No. 1:23-CR-20373, 2024 WL 4225541, at *4 (E.D. Mich. Sept. 18, 2024) (collecting cases).

Here, the affidavit describes an ongoing drug trafficking conspiracy. *See* ECF No. 35-3 at PageID.100–02. Remember, Detective Sauve applied for and obtained the search warrant on September 12, 2023. *Id.* at PageID.105. The affidavit discusses local fentanyl trafficking dating back to November 2022, and Defendant was later targeted as a suspected dealer, using his car to sell fentanyl to three sources at least as recently as July 26, 2023. *See id.* at PageID.99–102. Further, although undated, Detective Sauve's surveillance—which revealed Defendant present for hand-to-hand transactions at the 1013 22nd Street Residence—occurred "[d]uring the month of September," and "over the last ten days," indicating that Defendant was still involved in drug trafficking within ten-to-twelve days of Detective Sauve receiving the search warrant.[2] *Id.* at

---

[2] Defendant critiques the fact that the affidavit doesn't include specific dates on which the surveillance or drug transactions occurred. *See* ECF No. 35 at PageID.87. Dates are preferred but unnecessary. *See Barnes*, 2024 WL 4225541, at *5 (collecting cases); *see also Perry*, 864 F.3d at 415 (6th Cir. 2017) ("It would ... have been preferred for [the affiant] to have indicated the specific dates, but the fact that all of the multiple and repeated activities were observed within a defined period of less than seven weeks prior to the date of the affidavit" defeated staleness). Instead, all that's needed is some temporal reference point for courts to assess (1) when the investigatory acts occurred in relation to when the eventual search occurred, and (2) whether that temporal reference indicates the alleged crime was ongoing. *See Barnes*, 2024 WL 4225541, at *5 (citing *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006)); *see also id.* at *4, n.4 (citing *United States v. Thomas*, 605 F.3d 300, 310 n.9 (6th Cir. 2010)).

PageID.101–02. This ongoing drug activity suggests that evidence of drug trafficking would likely still be in Defendant's Chrysler 300 during a September 2023 search.

All in all, the fact that the affidavit describes Defendant participating in ongoing drug trafficking means the first factor favors the Government—which Defendant ultimately concedes. *See* ECF No. 35 at PageID.88 ("This factor leans against Mr. Schalk's staleness argument."). And "evidence of ongoing criminal activity . . . generally defeat[s] a" staleness claim, *Greene*, 250 F.3d at 481, so even without considering the remaining factors, the information is likely not stale. But this Court will consider all factors for completeness.

**b.**

Moving to the second factor—what the Sixth Circuit calls "the criminal"—courts ask whether the defendant was "nomadic or entrenched" based on the affidavit's information. *Abboud*, 438 F.3d at 572. In this case, regardless of whether Defendant was nomadic or entrenched, this factor cuts against staleness. Indeed, because Defendant's car is the searched property at issue, if he was nomadic, as he argues, ECF No. 35 at PageID.88, the probable place of storage for evidence of his alleged ongoing drug trafficking is his car. And even if he were entrenched, the affidavit indicates he was entrenched at Chamberlain's 22nd Street Residence and the surrounding area, where he would allegedly effectuate drug activities using his car. *See* ECF No. 35-3 at PageID.100–02.

**c.**

Turning to the third factor—"the thing to be seized"—courts analyze whether the item was "perishable and easily transferrable or of enduring utility to its holder." *Abboud*, 438 F.3d at 573. Because drugs are easy to consume and move, this factor often benefits defendants charged with drug crimes. *See United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009). But it does not *per*

*se* benefit defendants in drug cases. *See United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017); *see also Barnes*, 2024 WL 4225541, at *7. Indeed, when an affidavit contains evidence of ongoing drug trafficking, it is more probable that officers will find drugs at the searched property. *See Church*, 823 F.3d at 356. And when the warrant seeks nonperishable items on top of drugs, the fact that drugs are easy to consume is less relevant. *United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015).

Although close, this third factor favors the Government on balance. While the affidavit and warrant sought perishable drugs, ECF No. 35-3 at PageID.98–99, these drugs were from an ongoing drug trafficking operation. Indeed, the affidavit indicates that Defendant used his car for multiple drug deals, *see id.* at PageID.100–02, suggesting he kept a ready supply in his car and weighing against staleness. *See Church*, 823 F.3d at 356. Further, Detective Sauve sought nonperishable items that had enduring utility to Defendant. For example, Detective Sauve sought firearms, drug proceeds, records, electronic evidence, and drug paraphernalia, ECF No. 35-3 at PageID.98–99, all of which may be stored in a car, counseling against staleness. *See Sinclair*, 631 F. App'x at 348 (stating that an affidavit including firearms, records, and drug paraphernalia counsels against staleness).

### d.

Finishing with the fourth factor—"the place to be searched"—courts evaluate whether the searched property was a "mere criminal forum of convenience or secure operational base." *Abboud*, 438 F.3d at 573. Often, the property is a "secure operational base" when the affidavit contains information that a defendant has used that property on multiple occasions for criminal activities. *Sinclair*, 631 F. App'x at 348.

This factor is also close but favors Defendant. True, the affidavit indicates that Defendant used his car for drug activities on multiple occasions and often enough that it became recognizable. *See* ECF No. 35-3 at PageID.101–02. And this ongoing use is largely why the affidavit's information is ultimately not stale. *See supra* Section III, A, 3, a–c. But Defendant's car isn't an "operational *base*" for the alleged drug trafficking, like, say, the 22nd Street Residence was, and Sixth Circuit precedent has distinguished between vehicles and secure operational bases. *See United States v. Redmond*, 475 F. App'x 603, 609 (6th Cir. 2012) (noting that the "search was conducted on a mobile vehicle rather than a secure operational base" but ultimately concluding that under the circumstances, the affidavit's information wasn't stale). In any event, the information here is not stale because three out of four factors—including the most critical factor, the first factor—weigh in favor of the Government.

All said, the issuing magistrate had a substantial basis for the probable cause determination such that it wasn't arbitrary. First, the three sources that Defendant challenges were sufficiently reliable. Second, the affidavit sufficiently established a nexus between Defendant's Chrysler 300 and the evidence of drug trafficking that Detective Sauve sought. And third, the affidavit's information wasn't stale.

### B. Good-Faith Exception & Exclusionary Rule

Because this Court determined that the issuing judge's probable cause determination checks out, the Court need not address Defendant's good-faith exception argument. *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014); *United States v. Mills*, 357 F. Supp. 3d 634, 651 (E.D. Mich. 2019). But for completeness, even if the search of Defendant's car was based on a defective warrant, the good-faith exception applies here.

- 18 -

The good-faith exception rests on "well-tilled legal terrain." *Sanders*, 106 F.4th at 467.
Generally, evidence seized unlawfully cannot be used in criminal prosecutions. *Id.* But that rule—
the exclusionary rule—is not a creature of the Constitution. *Id.* Instead, it is a judge-made remedy
for Fourth Amendment violations. *Id.* (citing *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). Its goal?
To deter police misconduct. *Id.* But good-faith conduct is not misconduct. *Id.* So when "an officer
acts with an objectively 'reasonable good-faith belief' that her conduct is lawful, the exclusion is
unwarranted." *Id.* (quoting *Davis v. United States*, 564 U.S. 229, 239 (2011)). That's the good-
faith exception. See *id.* In other words, if an officer relies in good faith on a judge-issued warrant,
suppression is off the table, even if the warrant lacks probable cause. *Id.* at 467–68 (citing *United
States v. Leon*, 468 U.S. 897, 909, 922 (1984)). Suppression is off the table because mistakes in
probable cause determinations are usually the issuing judge's fault, not the officer's. *Id.* at 468
(citing *Davis*, 564 U.S. at 239). And officers are not expected to second-guess a judge's probable
cause decision. *Id.*

Still, there are limits—exceptions to the exception. *See United States v. Rice*, 478 F.3d 704,
712 (6th Cir. 2007). The good-faith exception doesn't apply if: (1) the magistrate was misled by
false statements the officer knew were untrue or would have known were untrue "except for his
reckless disregard for the truth," (2) the magistrate abandoned neutrality and acted as a "rubber
stamp for the police," (3) the affidavit was so bare bones or lacking in probable cause that no
reasonable officer could rely on it, or (4) the warrant was "facially deficient" such that "the
officer's reliance on the warrant was not in good faith or objectively reasonable." *Id.* (cleaned up).

Defendant invokes the third scenario, the "bare bones" affidavit scenario. ECF No. 35 at
PageID.89. Up front, Defendant faces an uphill battle: an affidavit is bare bones only if it lacks "a
'minimally sufficient nexus' between the place to be searched and the evidence of wrongdoing to

be seized at that place," a bar far lower than probable cause nexus. *United States v. Neal*, 106 F.4th

568, 572 (6th Cir. 2024) (citing *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en

banc)). Put differently, the Sixth Circuit "bestow[s] the moniker of 'bare bones' only on those

affidavits that consist of no more than a hunch that evidence might be found at a location." *Id.* And

all it takes for an affidavit to survive a bare-bones challenge is "a 'modicum of evidence, however

slight' connecting the illegal activity and the place to be searched." *Id.* (citing *United States v.*

*White*, 874 F.3d 490, 496–97 (6th Cir. 2017)).

Defendant bases his bare-bones-affidavit argument on *United States v. Helton*, 414 F.3d

812 (6th Cir. 2003). But *Helton* is inapposite. In *Helton*, the only information in the affidavit that

could have meaningfully supported a probable cause finding affidavit came from an anonymous

tip conveyed to a confidential informant, who then relayed it to law enforcement. *Id.* at 822–23.

The tip was vague. *Id.* And officers did nothing to corroborate the anonymous tip. *Id.* On those

facts, the Sixth Circuit found that a "reasonable officer would recognize that without more

corroboration, the . . . affidavit came well short of establishing probable cause," declined to apply

the good-faith exception, and held that the affidavit was bare bones. *Id.* at 825. By contrast, here,

there were reasonably detailed tips from *three* sources who weren't anonymous, and Detective

Sauve *did* make efforts to corroborate the reliability of those sources through surveillance and his

investigation. *See* ECF No. 35-3 at PageID.100–02. Put simply, Detective Suave's affidavit was

far from bare bones.

Indeed, Sixth Circuit cases featuring affidavits with similar or lesser indicia of probable

cause satisfied good-faith standards. Consider, for example, a more recent *Helton*: *Helton v. United*

*States*, 35 F.4th 511 (6th Cir. 2022). There, an affidavit for a warrant to search the defendants

residence included just four pieces of information: (1) anonymous complaints of the defendant's

drug dealing, (2) an anonymous tip who "claimed to have witnessed a drug transaction" at the defendant's home, (3) the defendant having "small bills and a clear baggie" containing an unidentified "residue" when the officers executed a prior arrest warrant and (4) the affiant's "experience and knowledge." *Id.* at 518. Law enforcement did not corroborate the anonymous tip and complaints. *Id.* at 519–20. The anonymous complaints were stale. *Id.* at 519. Further, "[a]lthough the judge who issued the search warrant [could] give considerable weight to the conclusion of experienced law enforcement officers," there was little in the affidavit about the affiant's experience. *Id.* at 520. Finally, nothing in the affidavit indicated that the clear baggie and small bills were in any way incriminating. *Id.* at 520. So the Sixth Circuit held that the warrant lacked probable cause because the affidavit did not demonstrate a nexus between the defendant's home and criminal activity. *Id.*

Even so, the Sixth Circuit applied the good-faith exception in this later *Helton*, declining to declare the affidavit bare bones. *Id.* at 522. In so doing, the Sixth Circuit provided the following analysis:

> The anonymous complaints provide minimal information, but the information is related to the trafficking of drugs. Though the reliability of the source's tip is lacking in several respects, it provides underlying factual circumstances regarding the basis of the informant's knowledge. That tip provides some support for a connection between drug dealing and [the defendant's] home because, while there is no information about the reliability of the source other than the bald reference by the affiant officer to a "reliable source," the source did claim to personally observe a drug deal and connects that drug deal with [the defendant's] residence. The presence of a clear baggie with some sort of residue and the opinion of the officer also supply a minor inference of support. Under the good faith standard, the totality of the information in the affidavit provides some modicum of evidence that drug dealing was occurring at [the defendant's] home.

*Id.* (internal citations and quotations omitted). Similarly, here, the three sources' statements relate to drug trafficking. *See* ECF No. 35-3 at PageID.100–02. The sources claimed to partake in drug deals that connected Defendant's Chrysler 300 to drug dealing. *See id.* Law enforcement's

investigation into local fentanyl trafficking tied Defendant to it. *See id.* And notably, Detective Sauve's affidavit included even more than this later *Helton*'s: (1) to pummel a long-dead horse, the surveillance corroborated the sources' reliability, and (2) the affidavit included information about Detective Sauve's eight years of experience and his specialization in drug investigations because of his assignment to BAYANET. *See id.* at PageID.99, 101–02.

At bottom, the point of all this *Helton*-talk is this: Defendant's reliance on the first *Helton*, *United States v. Helton*, 414 F.3d 812 (6th Cir. 2003), is misplaced, and if the Sixth Circuit applied the good-faith exception to the terse affidavit in the recent *Helton*, *Helton v. United States*, 35 F.4th 511 (6th Cir. 2022), then the good-faith exception applies here.

In sum, Defendant's Motion to Suppress, ECF No. 35, will be denied. Detective Sauve's affidavit provided a substantial basis for the issuing magistrate to find probable cause to search Defendant's Chrysler 300. And even if the affidavit didn't, the good-faith exception applies, so suppression is not warranted.

## IV.

Accordingly, it is **ORDERED** that Defendant Armando Schalk's Motion to Suppress, ECF No. 35, is **DENIED**.

Further, it is **ORDERED** that the time from January 8, 2025–March 11, 2025, is **EXCLUDED** as delay under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7).

Further, it is **ORDERED** that the Scheduling Order, ECF No. 23, as amended by ECF No. 28, is **ADJOURNED** as follows:

| | |
|---|---|
| Motions in Limine Due: | February 11, 2025 |
| Plea Cutoff: | February 18, 2025 |
| Final Pretrial Conference: | February 25, 2025, at 11:00 AM EST |
| Jury Trial: | March 11, 2025, at 8:30 AM EDT |

**This is not a final order and does not close the above-captioned case.**

Dated: January 8, 2025       s/Thomas L. Ludington
               THOMAS L. LUDINGTON
               United States District Judge